## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF MONTANA

In re

**DELORES M. JOLIE**,

        Debtor.

Case No. **12-61188-7**

**DELORES M. JOLIE**,

        Plaintiff.

-vs-

Adv No. **13-00009**

**US DEPARTMENT OF EDUCATION**,

        Defendant.

## MEMORANDUM OF DECISION

At Butte in said District this 10th day of March, 2014.

In this adversary proceeding the Plaintiff/Debtor Delores M. Jolie ("Jolie") seeks a determination that excepting her student loan debt owed to the Defendant US Department of Education ("DoE") would impose an undue hardship on her and therefore is dischargeable under 11 U.S.C. § 523(a)(8). Defendant filed an answer denying that Debtor satisfies the test for undue hardship. Trial of this adversary proceeding was held at Great Falls on January 10, 2014. Jolie appeared and testified, represented by attorney Scott M. Radford ("Radford") of Scott M. Radford Law Firm, Great Falls. Defendant was represented by assistant United States attorney George F. Darragh, Jr. ("Darragh"), and Defendant called to testify Travis Baber ("Baber"), who

1

is a claim and fraud specialist for Aspire Resources I ("Aspire"), authorized servicer for the

Defendant DoE, which services Jolie's student loans. Plaintiff's Exhibits ("Pl. Ex.") A, B, C, D,

E, F, and Defendant's ("Def. Ex.") A, B, C, D, and E, all were admitted into evidence without

objection. At the conclusion of the parties' cases-in-chief the Court granted the parties time to

file post-trial briefs, which have been filed and reviewed by the Court together with the record

and applicable law. This matter is ready for decision. For the reasons set forth below judgment

shall be entered in favor of the Plaintiff Jolie discharging her student loan debt under § 523(a)(8)

because excepting her student loans from her discharge would impose an undue hardship on the

Debtor.

This Court has jurisdiction of this adversary proceeding under 28 U.S.C. § 1334(b). This

is a core proceeding to determine dischargeability of a particular debt under 28 U.S.C. §

157(b)(2)(I). This Memorandum of Decision includes the Court's findings of fact and

conclusions of law pursuant to F.R.B.P. 7052 (applying FED. R. CIV. P. 52 in adversary

proceedings).

## FACTS

The approved Pretrial Order (Docket No. 29) sets forth the following agreed facts:

(a) On or about August 11, 2008, Plaintiff Jolie executed a promissory note to secure a Federal Direct Consolidation Loan from the U.S. Department of Education. These loans were disbursed in the amounts of $59,264 and $58,899 at five percent (5.0%) per annum. These loans were made by the Department under the William D. Ford Federal Direct Loan Program under Title IV, Part D of the Higher Education Act of 1965, as amended, 20 U.S.C. § 1087a (34 C.F.R. § 685).

(b) Pursuant to 34 C.F.R. § 685.202(b), a total of $20,031.00 in unpaid interest was capitalized and added to the principal balance.

(c) Almost exclusively since the time of the loans they have been in a

forbearance status.  During this status the monthly loan payments are temporarily suspended.  Interest continues to accrue and is capitalized and added to the principal balance.

(d) To date $0.00 in payments have been credited to the account[1].

(e) At all times since August 11, 2008, Jolie has been employed.  The adjusted gross income reported on her federal tax returns for the years are:

| | |
|---|---|
| 2008 | $46,097[2] |
| 2009 | $26,037 |
| 2010 | $26,539 |
| 2011 | $26,100 |
| 2012 | $21,100 |

(f) Total debt owed on 01/10/2014 is $149,100.70.

Additional relevant facts were shown from the testimony and exhibits.  On the date of trial her student loan debt was $149,176.  Def. Ex. A.

Jolie is 57 years old and lives in Great Falls in a home she owns.  She has one adult son, Nicholas ("Nic") who is 28 years old.  Nic lives with Jolie and does not work, but he is a student.[3]  Jolie testified that Nic received social security payments as a minor, but he has no government benefits at present, and no means of support.  In her discovery responses Jolie wrote that Nic had insurance through his school which would end at the end of the fall semester.  Def.

---

[1]This agreed fact was changed by Jolie's and Baber's testimony establishing that approximately $1,600 was paid by the Trustee from the Debtor's bankruptcy estate to the student loan creditors.  Otherwise, she admitted that she has made no payments during the forbearance.

[2]Asked on cross examination about the 2008 income, which is larger than income shown in other years, Jolie testified that the $46,097 in 2008 included a one-time settlement of a wrongful discharge claim, along with her usual income.  Def. Ex. D, p. 3.

[3]Jolie listed Nic's medical/mental problems as including PTSD, bi-polar disorder, depression, ADD, and a lesion on his front brain lobe which causes him petit grand mal seizures. She stated that his problems keep him from being employed, but he takes classes on-line.

Ex. D, p. 3.

Jolie suffers from numerous health problems, which she described as including osteoarthritis, abnormal heart rhythms, uterine separation, and in 2010, an abdominal attack. Jolie testified that she has had no health insurance[4] or professional health care since 2006. She testified that she had all her teeth extracted after her teeth disintegrated,[5] and she had to go to the emergency room for mouth pain. She cannot afford to see a dentist, and she has not gotten dentures or implants to replace her lost teeth.

Jolie graduated from Great Falls High and attended Rocky Mountain College ("Rocky") in Billings. She left Rocky because of medical issues and enrolled at the College of Great Falls ("CGF") in 1983, where she applied for her first student loan. She left CGF, got married and had her son Nic. Later she divorced, and she testified that she lived in a homeless shelter for a time, then lived in public housing. She was on Aid to Families for Dependent Children ("AFDC") from 1989 to 1994, but not since then.

Jolie returned to CGF and earned a bachelor's degree, followed by a master's degree in Human Services with an emphasis on family services which she earned in 2003. She testified that she spent all of her student loans to obtain her education.

She testified that she was employed in 2008 at the time she consolidated her student loans. Jolie used a wrongful discharge settlement which she received in 2008 to pay arrears on

---

[4]Jolie testified that she has visited the website www.healthcare.gov to see if she qualifies for subsidies under the Affordable Care Act. However, she testified that she is confused. She believes she may qualify for a monthly subsidy of more than $500, but does not know if her son Nic would be covered or if she would have to pay a premium.

[5]As she explained the loss of her teeth, she used sugared throat lozenges at night when she slept, not knowing that the sugar would rot her teeth.

her mortgage, after paying a one-third contingency fee to her attorney.

For the last seven years Jolie has been employed as a program coordinator at a for-profit entity named Mountain Peaks, which runs programs under an annual grant contract with the Montana Department of Corrections. Jolie testified that she uses her education in her current job, where she works with children, hires, fires and conducts job skills training. Her job is her sole source of income. She testified that each July Mountain Peaks must obtain renewal of its contract with the Montana Department of Corrections. She testified that in July of 2010 Mountain Peaks' grant was cut. The grant is subject to renewal in July 2014, and Jolie testified that her financial situation will worsen if the grant it not renewed.

Jolie testified that her salary has not changed in the last 5 years. Def. Ex. D. She earns $26,100 annually. Her gross monthly income is between $2,000 to $2,100 per month, and her average net income ranges from $1,600[6] to $1,800 per month. She testified that her average monthly expenses always exceed her income.

Jolie filed a voluntary Chapter 7 petition on July 20, 2012, with her Schedules and Statement of Financial Affairs. A discharge of her debts was entered on October 29, 2012.

Travis Baber, who is a claim and fraud specialist for Aspire Resources I ("Aspire"), an authorized servicer for the Defendant DoE, which is servicing Plaintiff's student loans, testified that the bankruptcy trustee in Jolie's Chapter 7 bankruptcy case sent one payment to Aspire in the approximate amount of $1,600. Otherwise, Aspire has received no payments directly from Jolie.

---

[6]Defendant's Ex. D is Jolie's answers to interrogatories. At page 2, in her answer to Interrogatory No. 4, it states that her "semi-monthly" net income is $1,642. At trial, under cross examination Jolie testified that her answer to Interrogatory No. 4 was mistaken, and that she actually earns $1,642 net income once per month, not semi-monthly.

Jolie's biggest expenses are a first and second mortgage on her home, car insurance, and utilities including gas, water, electricity and phone.  Schedule J (Pl.'s Ex. B) lists Jolie's current monthly expenses in the total amount of $1,878, for mortgage ($754), utilities ($323 total), home maintenance ($108), food ($200), clothing ($30), laundry and dry cleaning ($30), medical and dental expenses ($225), transportation ($125), charitable contributions ($25), and car insurance ($58).  Defendant cross examined Defendant on several categories of her expenses.

Jolie valued her home on Schedule A at $90,000, with secured claims against it in the total amount of $79,075.  She testified that the second mortgage has approximately $1,300 still owing out of an original $2,600.  She pays $66 per month to the second mortgage, and she testified that when her power bill goes down she pays a little more on the second mortgage.

Jolie's utitilies include gas, water, electricity and telephone.  She testified that she does not have a cell phone.  She has only a land line and internet so that she can work from home.  Her water bill has increased to $145 per month and her gas bill increased from $48 to $55.  She testified that she is on budget billing, and she is always juggling her bills, "robs Peter to pay Paul," i.e., alternatively cutting one payment to pay another.

Asked on cross examination about her $225 per month medical expense, Jolie explained that she self-medicates using supplements she found researching on the internet.  Because she has no insurance and cannot afford to go to a medical doctor, she testified, she takes supplements so that she can keep going to work.

The $108 in home maintenance is for plumbing and home repairs.  Jolie testified that she does not own a lawn mower, so hires a lawn service because if she does not keep her lawn mowed she gets fined.  The $30 in laundry and dry cleaning, Jolie explained, pays for detergent

6

and other products so that she can wear clean clothes to work. For transportation Jolie drives a 1997 Ford Explorer, which a friend helps her keep running.

Jolie testified that she consolidated her student loans in order to lower the monthly payments, and got her interest rate on the student loans reduced from 8% to 5% per annum. Then she requested and obtained a forbearance through February of 2014. Personally, she has made no payments toward her student loan debt, but as stated above the trustee in her Chapter 7 case sent Aspire approximately $1,600 from her estate.

Jolie stated that she goes to the Salvation Army for help with her groceries, and goes to her church for help, but she also volunteers at her church and she testified that she gives back to her community.

Jolie filed her complaint initiating this adversary proceeding on March 25, 2013, seeking a determination that excepting her student loan debts owed to Defendant would impose an undue hardship on her based on her income and expenses. Jolie testified that if her employer lost its annual grant she would apply for other jobs, but that her student loan debt has badly reduced her credit score. Under questioning by the Court, Jolie testified that prospective employers consider her credit score, and because of her student loan debt her credit score is so low that it takes her out of consideration for higher paid employment.

Jolie testified that her consolidated student loans are in forbearance which ended in February 2014. The day before trial, she testified, the payment required for her student loan debt under the normal rules is $279 per month, which increases to $412 per month at "Level 2." Asked about other possible public assistance, Jolie explained that she has not been on welfare or public assistance since 1994. Under questioning by the Court, Jolie testified that she qualifies for

7

Supplemental Nutritional Assistance Program ("SNAP"), but she has no applied for SNAP because she believes there are other people more in need than she.   She has considered selling her home and getting alternative housing, but she explained that she moved out of public housing and welfare before, and does not want to go back.

   **Income Based Repayment Programs.**

   Jolie testified that she looked into income-based repayment plans ("IBR"), which Baber described are plans tied to a debtor's income and student debt load.  She calculated that her payments under an IBR would work out to $35 per month, Def.'s Ex. C, but she testified that she does not have $35 left each month to make payments to her student loans.  Her payments, after the current forbearance expires, initially become due on March 21, 2014.

   Baber testified that Jolie is eligible for IBR, and his calculations came out with the same payment as Jolie's.  He explained that while in an IBR plan, a debtor must reapply for the IBR each year for 25 years, and after 25 years the student loan debts can be forgiven.  In addition, Baber explained that there are program options for debt forgiveness other than the IBR to address Jolie's student loan debt.

   One program Baber described is a public service program, in which a debtor works for a nonprofit or for-profit public service organization and makes payments for 10 years, at the end of which the balance can be forgiven.  Def. Ex. E.  Under questioning by the Court about the monthly payment required for the public discharge, Baber did not answer with an amount, but repeated that anyone wanting a public service discharge must apply for an IBR plan.  Baber answered "Yes" when asked whether a debtor can participate in a IBR plan and public service loan forgiveness plan at the same time.  Another alternative Baber described for someone on

public assistance is an available deferment for a period of 12 months, during which the federal government pays the interest on the student loan debt.

Baber testified that Jolie's loans currently are under a "general" forbearance status which expired at the end of February 2014. According to Baber, Jolie still has an additional "economic forbearance" program available for a period of 36 months more. When asked why Jolie's student loans have been in forbearance since 2008, Baber answered that on Def. Ex. B she showed that she suffered from a hardship.

Asked about whether health issues provided additional programs for debt forgiveness, Baber testified that if a debtor can show disability he or she can seek a permanent and total discharge. However, the disability must be shown to be both permanent and total. In the event of a debtor's death, Baber testified, Aspire would request that the DoE write the student loans off and the federal government would forgive the loans. Asked about any other programs, Baber advised that there may be loan forgiveness programs available through state government, including based upon public service.

### DISCUSSION

The discharge of student loan obligations is governed by 11 U.S.C. § 523(a)(8), which provides in relevant part after amendments made by the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 (Pub. L. 109-8) ("BAPCPA"), effective October 17, 2005:

> (a) A discharge under section 727, 1141, 1228(a) 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt –
>
> * * * *
>
> (8) unless excepting such debt from discharge under this paragraph will impose an undue hardship on the debtor and the debtor's dependents, for –

9

      (A)(I) an educational benefit overpayment or loan made,

          insured, or guaranteed by a governmental unit,
          or made under any program funded in whole or
          in part by a governmental unit or nonprofit
          institution; or

          (ii) an obligation to repay funds received as an
          educational benefit, scholarship, or stipend; or

      (B) any other educational loan that is a qualified educational
      loan, as defined in section 221(d)(1) of the Internal Revenue
      Code of 1986, incurred by a debtor who is an individual

*Educ. Credit Mgmt. Corp. v. Nys (In re Nys)*, 446 F.3d 938, 942 n. 3 (9th Cir. 2006).

      The Bankruptcy Code does not define "undue hardship." *Nys* at 943. Courts have held,

however, that Congress intended the term to be interpreted strictly, and on a case-by-case basis.

*Albert v. Ohio Student Loan Comm'n (In re Albert)*, 25 B.R. 98 (Bankr. N.D.Ohio 1982); *United*

*States v. Brown (In re Brown)*, 18 B.R. 219 (Bankr. D. Kan. 1982); *Garmerian v. R.I. Higher*

*Educ. Assistance Auth. (In re Garmerian)*, 81 B.R. 4 (Bankr. R.I. 1987). As the court in *Brown*

noted:

      Mere financial adversity is insufficient, for that is the basis of all petitions in
      bankruptcy.

*Brown*, 18 B.R. at 222. On the other hand, the Bankruptcy Code does not require that the debtor

"live in abject poverty . . . before a student loan may be discharged." *In re Mallinckrodt*, 260

B.R. 892, 900 (Bankr. S.D. Fla. 2001) (*quoting In re Faish*, 72 F.3d 298, 305 (3rd Cir. 1995)).

      In a complaint to determine the dischargeability of student loan debt a debtor has the

burden of proof to show evidence of undue hardship sufficient to discharge the debt. *Hedlund v.*

*Educ. Res. Inst.,* 718 F.3d 848, 851 (9th Cir. 2013); *Roth v. Educ. Credit Mgmt. Corp.*, 490 B.R.

908, 916-17 (9th Cir. BAP 2013); *In re Mason*, 464 F.3d 878, 881 (9th Cir. 2006); *In re Rifino*, 245 F.3d 1083, 1087-88 (9th Cir. 2001); *In re Pederson*, 18 Mont. B.R. 429, 434 (Bankr. D. Mont. 2000), *In re Thomsen*, 17 Mont. 493, 499, 234 B.R. 506, 510 (Bankr. D. Mont. 1999).

The United States Court of Appeals for the Second Circuit established the *Brunner* test for determining "undue hardship" in the educational loan context. *In re Brunner*, 831 F.2d 395, 396 (2nd Cir. 1987). According to *Brunner*, in order to receive a discharge under 11 U.S.C. § 523(a)(8) a debtor must show:

> (1) that the debtor cannot maintain, based on current income and expenses, a "minimal" standard of living for herself and her dependents if forced to repay the loans; (2) that additional circumstances exist indicating that this state of affairs is likely to persist for a significant portion of the repayment period of the student loans; and (3) that the debtor has made good faith efforts to repay the loans.

*Id.* The Ninth Circuit Court of Appeals follows the *Brunner* test to determining if a debtor has shown undue hardship under § 523(a)(8). *Hedlund*, 718 F.3d at 851; *Mason*, 464 F.3d at 881; *Nys*, 446 F.3d at 941 n.1, 943; *United Student Aid Funds v. Pena (In re Pena)*, 155 F.3d 1108, 1114 (9th Cir. 1998) ("We adopt the *Brunner* test as the test to be applied to determine the 'undue hardship' required to discharge student loans in bankruptcy pursuant to 11 U.S.C. § 523(a)(8)(B)"); *Rifino*, 245 F.3d 1083, 1087 (9th Cir. 2001). In *Pena*, the Court summarized the *Brunner* test as thus,

> First, the debtor must establish "that she cannot maintain, based on current income and expenses, a 'minimal' standard of living for herself and her dependents if forced to repay the loans." *Brunner*, 831 F.2d at 396. The court noted that this portion of the test "comports with common sense" and had already "been applied frequently as the minimum necessary to establish 'undue hardship.' " *Id.* (citing *In re Bryant*, 72 B.R. 913, 915 (Bankr.E.D.Pa.1987)).
>
> Second, the debtor must show "that additional circumstances exist indicating that this state of affairs is likely to persist for a significant portion of the repayment

period of the student loans." *Brunner*, 831 F.2d at 396.  This second prong is intended to effect "the clear congressional intent exhibited in section 523(a)(8) to make the discharge of student loans more difficult than that of other nonexcepted debt." *Id*.

The third prong requires "that the debtor has made good faith efforts to repay the loans . . . ." *Brunner*, 831 F.2d at 396.  The "good-faith" requirement fulfills the purpose behind the adoption of section 523(a)(8). *Brunner*, 46 B.R. at 754-55.  Section 523(a)(8) was a response to "a 'rising incidence of consumer bankruptcies of former students motivated primarily to avoid payment of education loan debts.' " *Id.*, (quoting the Report of the Commission on the Bankruptcy Laws of the United States, House Doc. No. 93-137, Pt. I, 93d Cong., 1st Sess. (1973) at 140 n. 14).  This section was intended to "forestall students . . . from abusing the bankruptcy system." *Id.*

*Pena*, 155 F.3d at 1111; *Rifino*, 245 F.3d at 1088-89.

Jolie cites the concurring opinion from *Roth* that the *Brunner* test is "truly a relic of times long gone."  490 B.R. at 920.  She argues that the large amount of her debt, modest pubic service income and uncertain future employment create a "mental prison," and she fits the definition of undue hardship if anyone does.  Defendant argues that *Pena* requires application of the *Brunner* test in this Circuit.

This Court remains bound to follow the *Brunner* test.  *Hedlund,* 718 F.3d at 851; *see, e.g., Gettle v. Sallie Mae Servicing Corp. (In re Gettle)*, 19 Mont. B.R. 59, 257 B.R. 583 (Bankr. D. Mont. 2000); *Marsh v. Moorehead College (In re Marsh)*, 19 Mont. B.R. 39, 257 B.R. 569 (Bankr. D. Mont. 2000).  A debtor must prove all three elements identified in *Brunner* before discharge can be granted on grounds of undue hardship.  *Hedlund,* 718 F.3d at 851; *Mason*, 464 F.3d at 882; *Rifino*, 245 F.3d at 1087-88.

The first prong of the *Brunner* test requires that Jolie establish "that she cannot maintain, based on current income and expenses, a 'minimal' standard of living for herself and her

dependents if forced to repay the loans." *Hedlund,* 718 F.3d at 851; *Mason*, 464 F.3d at 882; *Brunner*, 831 F.2d at 396.

Defendant, relying on discovery responses, contends that Jolie can maintain a minimal standard of living and repay the loan because she has a net "semi-monthly" income of $1,642, or $3284 per month, and disposable income of $1,431.  Def. Ex. D, p. 2, answer 4f.  At trial, however, Jolie and her attorney corrected that discovery response by testifying that her net income is $1,642 each month, not semi-monthly.  Her trial testimony is corroborated by Def.'s Ex. C where she stated her annual adjusted gross income is $26,100, as she confirmed at trial.[7]

The evidence shows that the total amount of the student loan debt in this case at the time of trial is $149,176.  Jolie testified that the servicer wants payments of at least $279 per month, or $35 per month under an IBR.  Def. Ex. C.  She testified that she does not have an extra $35 per month to pay to her student loans.  Her testimony is corroborated by her Schedule J, which shows her monthly expenses total $1,878, which exceeds her net monthly income of $1,642.  Defendant did not offer any evidence that Jolie has $35, or any amount, available to pay.

Jolie lives by robbing Peter to pay Paul, juggling her bill payments to pay something to her bills.  As stated above, she is not required to live in abject poverty before her student loans may be discharged.  *Mallinckrodt*, 260 B.R. at 900.  Yet, at present, she juggles bills and drives a 17 year old vehicle while working and caring for an adult mentally disabled son who otherwise would be without a home or support.  She has no health insurance, and cannot even pay to replace her lost teeth.

The Court finds the evidence is clear and overwhelming that Jolie cannot maintain, based

---

[7]$26,100 divided by 12 months equals $2,175 gross income per month.

on her current income and expenses, a minimal standard of living if forced to repay the $149,176 in student loan debt. Jolie lives modestly already. She declined SNAP benefits, for which she testified she is eligible, because others are more in need of limited resources. If Jolie were forced to pay the $279 per month which she testified is required outside an IBR she would be left without sufficient funds to pay her utilities or mortgages, and still could not pay for health insurance which under federal law soon is mandated or be able to replace her teeth. The Court concludes that Jolie has satisfied the first prong of the *Brunner* test. *Mason*, 464 F.3d at 882.

The second prong requires a debtor prove that additional circumstances exist indicating that this state of affairs is likely to persist for a significant portion of the repayment period of the student loans. *Mason*, 464 F.3d at 882; *Brunner*, 831 F.2d at 396. These additional circumstances are meant to be objective factors which a court can consider when trying to predict a debtor's future income, but the debtor does not have a separate burden to prove "additional circumstances" beyond the inability to pay presently or in the future. *Mason*, 464 F.3d at 882-83, quoting *Nys*, 446 F.3d at 945. *Nys* provide the following list of "additional circumstances" a court may consider, including but not limited to:

> [ (1) ] Serious mental or physical disability of the debtor or the debtor's dependents which prevents employment or advancement; [ (2) ] The debtor's obligations to care for dependents; [ (3) ] Lack of, or severely limited education; [ (4) ] Poor quality of education; [ (5) ] Lack of usable or marketable job skills; [ (6) ] Underemployment; [ (7) ] Maximized income potential in the chosen educational field, and no other more lucrative job skills; [ (8) ] Limited number of years remaining in [the debtor's] work life to allow payment of the loan; [ (9) ] Age or other factors that prevent retraining or relocation as a means for payment of the loan; [ (10) ] Lack of assets, whether or not exempt, which could be used to pay the loan; [ (11) ] Potentially increasing expenses that outweigh any potential appreciation in the value of the debtor's assets and/or likely increases in the debtor's income; [ (12) ] Lack of better financial options elsewhere.

14

*Nys*, 446 F.3d at 947.

The evidence admitted at trial shows the existence of factors numbered above (1), (2), (7), (8) and (10). Jolie's disabled son lives with her, and without her would be homeless and without support. Her education is in social work, which is not shown to be lucrative. She is in her mid-50's with limited work expectancy. If she worked 12 more years to retirement and paid $35 per month in an IBR during that period the total paid would be $5,040, to more than $149,176 in student loan debt. There is little evidence of assets which could be used to pay the loans. A small equity exists in her home, which will increase when she pays off her second mortgage. However, selling her home would require expense of moving and setting up a new household, and whatever equity might be paid would hardly put a dent in the $149,176 in debt which continues to accrue interest. No evidence exists in the record that indicates her state of affairs is not likely to persist for a significant portion of the repayment period for the student loans. *Mason*, 464 F.3d at 882-83.

Leslie is employed and has shown that she can remain continuously employed, even though her employment is dependent upon annual renewals of a grant. She is making every effort to maximize her position as a social worker and is working in the field for which she was educated using the student loans. In this instance, Debtor has not purposely chose to live a lifestyle that prevents her from repaying her student loans. *See Nys*, 446 F.3d at 946. Neither does the evidence suggest that Leslie had a reasonable opportunity to improve her financial situation, yet chose not to do so. In fact, Debtor has considered other employment in her area of training, but success in seeking such employment has been impeded because of her low credit scores arising from the student loan debt. *Nys*, 446 F.3d at 946; *Rifino*, 245 F.3d at 1089. In

15

addition, the overwhelming fact of the Great Recession which in the recent past struck this nation cannot be ignored when evaluating Jolie's employment prospects or chances for more lucrative earnings.

*Nys* discusses that Congress sought to prohibit a "garden variety" debtor from discharging student loans, especially when the "garden variety debtor will presumably use her loan-funded education to substantially increase her income in the near future." *Nys*, 446 F.3d at 944; *Rifino*, 245 F.3d at 1087.  The Ninth Circuit explicitly stated:  "In comparison, forcing debtors who cannot reasonably be expected to increase their future income to make payments on their student loans when it causes them to fall below a minimal standard of living constitutes an 'undue hardship.'" *Id.*

Jolie borrowed student loans so that she could finish her education, and she did.   The Ninth Circuit wrote:

> We will presume that the debtor's income will increase to a point where she can make payments and maintain a minimal standard of living; however, the debtor may rebut that presumption with "additional circumstances" indicating that her income cannot reasonably be expected to increase and that her inability to make payments will likely persist throughout a substantial portion of the loan's repayment period.

*Nys*, 446 F.3d at 946.

Jolie testified that the amount of her student loan debt has adversely affected her credit score, and that prospective employers check her credit score when she attempts to apply for higher paying employment.  This evidence is uncontroverted, and it shows that her student loan debt prevents her, because of its effect on her credit score, from increasing her income, and this predicament will persist while the student loan debt remains.

16

Based on this evidence the Court finds that Jolie has, by evidence of the above-listed additional circumstances, rebutted the presumption and shown by a preponderance of the evidence indicating that her income cannot reasonably be expected to increase, and that her inability to make payments likely will persist throughout a substantial portion of the loan's repayment period.  The Court concludes that Jolie has satisfied the second prong of the *Brunner* test.

The third prong requires that the debtor has made good faith efforts to repay the student loans.  *Mason*, 464 F.3d at 884; *Pena*, 155 F.3d at 1114; *Brunner*, 831 F.2d at 396.  In *Hedlund*, a district court reversed a bankruptcy court's partial discharge of student loan debts for a debtor who was unable to pass the bar exam despite several attempts, after completing law school.  718 F.3d at 849-851.[8]  On appeal the district court concluded that the bankruptcy court's good faith ruling was erroneous and reinstated the entire amount of the student loans.  718 F.3d at 851.  The Ninth Circuit reversed, holding that evidence of the debtor's failure to minimize his expenses and efforts to negotiate and to make voluntary payments, "which could be interpreted to support a finding of lack of good faith, . . . was not so strong as to demand such a finding."  718 F.3d at 855.  In other words, the court concluded:  "In sum, even though some might disagree with the bankruptcy court's good faith finding, it was not clearly erroneous.  The court relied on substantial evidence in the record, and its factual inferences were permissible."  *Id*. at 856.

Defendant argues that Jolie has not made good faith efforts to repay the loans because she has been in forbearance with loan payments suspended.  However, forbearance is available as an

---

[8]An earlier appeal resulted in reversal by the BAP, which the Ninth Circuit vacated and remanded, after which a different bankruptcy judge again discharged most of Hedlund's student loan debt.  718 F.3d at 851.

option, which is part of Aspire's loan servicing and the student loan repayment program.  Def.

Ex. B.  The IBR program also is available, and Jolie's testimony and Def. Ex. C show that she

investigated the IBR, determined her eligibility, and calculated her payment under the IBR at

$35, which Baber corroborated.

>The Ninth Circuit wrote:

>"Good faith is measured by the debtor's efforts to obtain employment, maximize income, and minimize expenses." *Penn. Higher Educ. Assistance Agency v. Birrane (In re Birrane)*, 287 B.R. 490, 499 (9th Cir. BAP 2002) (internal quotation marks and citations omitted); *see also In re Pena*, 155 F.3d at 1114.  "Courts will also consider "[a] debtor's effort – or lack thereof – to negotiate a repayment plan, although a history of making or not making payments is, by itself, not dispositive."

*Hedlund*, 718 F.3d at 852, quoting *Mason*, 464 F.3d at 884.

>Unlike the debtors in *Birrane* and *Mason*, Jolie has been fully employed since 2008 and

has maximized her income.  *Hedlund*, 718 F.3d at 855; *Birrane*, 287 B.R. at 499-500; *Mason*,

464 F.3d at 885.  The uncontroverted evidence shows that Jolie cannot obtain higher paying

employment because of the effect of her student loan debt on her credit score.  The evidence also

shows that Jolie has minimized her expenses.  She supports herself and her disabled son for

$1,878 per month, drives a 17 year old vehicle and lives frugally, without health insurance and

without replacing her lost teeth.  No evidence exists that her expenses include "immoderate"

items such as haircuts, child care and internet that could all be reduced, which the district court

used to reverse a finding of good faith in *Hedlund*, 718 F.3d at 852, 853.  Jolie is living by

robbing Peter to pay Paul, paying less on some of her bills to make up for late payments on other

bills.  Her internet service through her land line is so that she can work from home.

>The testimony of both witnesses shows that about $1,600 from Jolie's bankruptcy estate

was paid by the trustee in her case, although she has made no payments personally.  Thus, even though the $1,600 was paid by her bankruptcy estate, the evidence shows that Jolie has made a payment on her student loan debts equivalent to 45.72 payments of $35 per month, which she would be eligible to pay under the IBR.  Def. Ex. C.

Defendant argues that Jolie is eligible for an IBR which would reduce her monthly payment to $35, or even less if her income is reduced, and forgiveness at the end of 25 years on the balance owing.  Defendant contends that Baber's testimony revealed other repayment options available to the Debtor, including a possible disability discharge and other programs, and the debt forgiveness would not have adverse tax consequences.  Defendant concedes that Jolie is facing financial hardship, but notwithstanding argues that the evidence does not support granting a discharge of her student loan debts under § 523(a)(8).

The Court notes the other repayment programs described by Baber, including:  a deferment option based on public assistance; a public service discharge option for someone employed in nonprofit or for-profit public service work; an economic forbearance; and a disability discharge for permanent or total disability.  Jolie and Def. Ex. C show that she looked into the IBR program.  Def. Ex. E describes public service loan forgiveness but not the other programs Baber described, and no evidence exists that Aspire of DoE made Jolie aware of the alternative programs other than the IBR.  Def. Ex. C and the testimony of both witnesses show that Jolie investigated the IBR and calculated her payment, which demonstrates to this Court's satisfaction that Jolie made reasonable efforts to negotiate IBR eligibility and repayment, unlike the debtor in *Birrane* who failed to take any steps towards renegotiating a repayment schedule. *See Hedlund*, 718 F.3d at 855; *Birrane*, 287 B.R. at 500.

19

Based on the witness testimony and the uncontroverted evidence that Jolie's estate paid $1,600 on the student loans, and Jolie's investigation and calculation of the IBR in Def. Ex. C, the fact she has been fully employed in her field of study since 2008 and has minimized her expenses, the Court finds and concludes that Jolie has satisfied her burden under the "good faith" third prong of the *Brunner* test. *Hedlund*, 718 F.3d at 855; *Mason*, 464 F.3d at 884-85. The Court finds and concludes that Jolie has satisfied her burden under § 523(a)(8) for all student loan debt owed.

The evidence shows that this Debtor has raised herself, by effort, above the need for public assistance using the education paid for with her student loans. Absent some kind of windfall not shown by the evidence, it is simply unrealistic for anyone to expect that this Debtor can ever repay student loans exceeding $149,000, especially when the effect of the student loan debt on her credit score prevents her from finding higher paying employment. Requiring a $35 monthly payment on such an amount for 10 or 25 years will not begin to pay the amount owing, followed by a discharge under the IBR or other programs. With the Court finding that all three prongs of the *Brunner* test satisfied, Jolie's precarious employment situation relying on annual approval of grants, and her lack of health insurance, this Court cannot discern any sufficient reason to delay her relief in the form of discharge any longer.

## CONCLUSIONS OF LAW

1. This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 1334 and 157.

2. This is a core proceeding to determine dischargeability of particular student loan debts under 28 U.S.C. § 157(b)(2)(I) and 11 U.S.C. § 523(a)(8).

3.  The Plaintiff satisfied her burden of proof under § 523(a)(8) and all three prongs of the test set forth in *Brunner*, 831 F.2d at 396, *Hedlund*, 718 F.3d at 851, 854-55, *Nys*, 446 F.3d at 945-47, *Mason*, 464 F.3d at 882-85, *Rifino*, 245 F.3d at 1087-88, and *Pena*, 155 F.3d at 1114, and has shown by a preponderance of the evidence that excepting student loan debts owed to DoE from her discharge would impose on her an undue hardship.

IT IS ORDERED that pursuant to the foregoing findings and conclusions, the Court will enter a separate judgment in favor of the Plaintiff Jolie discharging her student loan debt under § 523(a)(8) because excepting her student loans from her discharge would impose an undue hardship on the Debtor.


BY THE COURT

HON. RALPH B. KIRSCHER
U.S. Bankruptcy Judge
United States Bankruptcy Court
District of Montana

21